# United States District Court
# District of Massachusetts

LAKINA MILLER, on behalf of
    her minor child, K.M.,
        Plaintiff,

     v.                     CIVIL DOCKET NO. 2009-12018-RBC[1]

MICHAEL J. ASTRUE,
    Commissioner of the
    Social Security Administration,
        Defendant.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION (#11) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING COMMISSIONER AND OPPOSITION TO PLAINTIFF'S MOTION (#13)

---

[1]
       With the parties' consent this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. §626(c).

COLLINGS, U.S.M.J.

## I. Introduction

On November 24, 2009, plaintiff Lakina Miller, on behalf of her minor child, K.M., filed a complaint (#1) seeking review of the final decision of Michael J. Astrue, Commissioner, Social Security Administration (the "Commissioner" or "SSA"), that the claimant was not disabled and, consequently, not entitled to Supplemental Security Income ("SSI"). The Commissioner filed an answer to the complaint (#8) together with the administrative record of the prior Social Security proceedings on April 20, 2010.

On July 30, 2010, the plaintiff filed a motion to reverse or remand the decision of the Commissioner (#11) and then on August 2, 2010, a supporting memorandum of law (#12). A month later on September 2, 2010, the defendant filed a motion for an order affirming the decision of the Commissioner (#13) as well as a memorandum of law (#14) in support of that motion. With the record complete, the dispositive motions are ripe for decision.

## II. Procedural Background

On May 17, 2006, Ms. Miller filed an application for SSI benefits for her

minor son, K.M., claiming that he was disabled. (TR[2] at 139-145) Approximately four months later on September 12, 2006, the application was denied. (TR at 115-117) Submitted on or about September 28, 2006, Ms. Miller's Request for Reconsideration (TR at 118) was denied on January 11, 2007. (TR at 119-121)

The plaintiff filed a Request for Hearing by Administrative Law Judge ("ALJ") on March 21, 2007. (TR at 122-129) A Notice of Hearing issued setting the matter for hearing on December 6, 2007. (TR at 130) The hearing was rescheduled and ultimately held on February 13, 2008 with Ms. Miller, her minor son and her attorney in attendance. (TR at 61-98, 131-138) On April 27, 2008, the ALJ issued an unfavorable decision finding that the plaintiff's son "had not been disabled, as defined in the Social Security Act, since May 1, 2006, the date the application was filed (20 CFR 416.924(a))." (TR at 101-114[3])

Ms. Miller filed a Request for Review of Hearing Decision/Order on May 2, 2008, thereby appealing the ALJ's decision. (TR at 59-60) The Appeals

---

[2]

"TR" references the administrative record.

[3]

There is an apparent discrepancy in the relevant dates. The Application Summary For Supplemental Security Income (TR at 139) states that Ms. Miller applied for SSI for her son on May 17, 2006. The ALJ's decision states the date of application as May 1, 2006. (TR at 104, 114) At least one other form, a Disability Report - Field Office, notes the protective filing date as being 050106. (TR at 174)

Council denied the plaintiff's Request for Review on September 25, 2009 (TR at 1-4), and in so doing effectively rendered the ALJ's decision to be the final agency decision. On November 24, 2009, Ms. Miller instituted the present action for judicial review of that final agency decision.

The parties agree that while the Request for Review was pending before the Appeals Council, on February 27, 2009, Ms. Miller filed a second application for SSI for her minor son, K.M. (#12 at 2; #14 at 2 n.4) This second claim was allowed with K.M. being approved to receive SSI benefits from February 27, 2009. (#12 at 2; #14 at 2 n.4) As a consequence, in the instant case review is sought of the Commissioner's denial of K.M.'s initial claim for SSI benefits from May, 2006 through February 27, 2009. (#12 at 2)

### III. The Facts

K.M. was born on March 15, 1999. (TR at 139) He lives with his mother and two brothers in Charlestown, MA; K.M. has no contact with his biological father. (TR at 82, 279) Regarding family history, his father is an alcoholic (TR at 283), his mother and maternal grandfather have been diagnosed with depression (TR at 278), his mother has a history of learning disability (TR at 279) and one of his brothers, his sibling closest in age, "has been diagnosed

with attention deficit hyperactivity disorder, along with oppositionality, and is prescribed both clonidine and Ritalin LA." (TR at 279)  In 1999 the family dysfunction was assessed by K.M.'s treating psychiatrist as of "moderate severity and moderate impairment." (TR at 219)

In November of 2005[4], K.M. was seen by Kevin Kennedy, Ph.D. ("Dr. Kennedy"), a licensed clinical social worker at Harvard Vanguard Medical Associates. (TR at 278)  The visit was prompted by concerns expressed by K.M.'s pediatrician and his first grade teacher about K.M.'s level of activity as well as his attention level. (TR at 278)  While his teacher had noted his "excessive activity level and difficulty attending," she did not see K.M. as being a behavioral problem, but rather as "'a good kid.'" (TR at 278)  The plaintiff reported that when he was in kindergarten K.M. had needed a "'lot of help'" and that he had experienced "some difficulty maintaining focus or concentration." (TR at 278)

Dr. Kennedy found K.M. to be "alert and fully oriented," "fairly attentive," "happy," and appearing to have intelligence falling within the average range.

---

[4]

There is one earlier significant event in K.M.'s medical history.  He suffered an apparent seizure at the age of eight days old and was hospitalized. (TR at 279) There has been no recurrence of this condition. (TR at 279)

(TR at 278)  Based on his examination and a review of K.M.'s symptoms, Dr. Kennedy diagnosed K.M. as having Attention Deficit Hyperactivity Disorder ("ADHD"), predominantly hyperactive-impulse type, with a possible learning disorder. (TR at 279)

In late December, 2005, Dr. Kennedy reviewed a Basic Assessment System for Children completed by K.M.'s first grade teacher, Mary Fahey ("Fahey"). (TR at 275-276)  According to Dr. Kennedy's notes:

> Results indicated elevated scores on seven sub-scales: Hyperactivity (Clinically Significant range), Aggression (At-Risk range), Anxiety (At-Risk range), Depression (Clinically Significant range), Attention problems(Clinically Significant range) and Learning Problems (Clinically Significant range).

TR at 276.

In Dr. Kennedy's opinion, "[t]he results are typical of children who display ADHD along with co-morbid emotional disturbance and learning disability." (TR at 276)

In March, 2006, K.M. began treating with Edward Rabe, Jr., M.D. ("Dr. Rabe"), a psychiatrist at Harvard Vanguard Medical Associates. (TR at 200, 222-223)  Dr. Rabe, too, diagnosed K.M. with ADHD and prescribed a daily 5mg dose of Adderall. (TR at 200, 223)

On June 24, 2006, Fahey, K.M.'s teacher, completed a questionnaire regarding K.M.'s school performance during the year. She noted that K.M. would be repeating first grade and that he was failing in reading, math and written language. (TR at 201-210) Fahey reported that K.M. had a serious or a very serious problem in activities[5] relating to acquiring and using information. (TR at 204) Specifically Fahey related that:

> [K.M.] entered first grade unable to recognize or repeat most sounds. By the end of the year he was able to recognize most consonants and some short vowel sounds. He does not yet understand enough to pass the end-of-year reading assessment. His math skills are rudimentary. He does not yet know the combinations of 10, a skill we've worked on all year. His writing skills are similar. He can not yet put sentences together but because of his charming and pleasant personality in group work he successfully enlists the aid of his friends to help him write.

TR at 204.

Fahey also reported that K.M. had obvious, serious, or very serious

---

[5]

These activities included comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recording and applying previously learned material and applying problem-solving skills in class discussions. (TR at 204)

problems in activities[6] relating to attending and completing tasks. (TR at 205). In particular, Fahey wrote that:

> Before [K.M.] was on medication in the spring, he was in constant motion leaving his seat on any pretext. He eventually had to be removed from his group because of disruptions to the other members.

TR at 205.

According to Fahey, K.M. had no problem interacting and relating with others; she described him as "a very kind, polite and personable little boy and is a friend to everyone." (TR at 206) K.M. also had no reported difficulties moving about and manipulating objects. (TR at 207) Lastly, Fahey indicated that, with respect to caring for himself, K.M. had a serious problem handling frustration appropriately, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs and responding appropriately to changes in own mood. (TR at 208) Fahey stated that "[K.M.] is a very sensitive and impulsive little boy....His impulsivity and inability to focus for any length of time led me to suspect he

---

[6]

These activities included paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, carrying out single-step instructions, carrying out multi-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at reasonable pace/finishing on time. (TR at 205)

suffered from ADHD. I reported my concerns to mom who consulted her pediatrician." (TR at 208-209) Fahey observed that K.M. "was more able to stay on task" once he started on medication for ADHD and he "exhibited fewer impulsive actions and was able to attend to tasks for longer periods of time." (TR at 209) While Fahey "noted an improvement in impulsivity when [K.M.] started on medication," his impulsivity had begun to increase again over the course of the final weeks of school. (TR at 210)

In July, 2006, the plaintiff reported to Dr. Rabe that K.M. and his brother were fighting daily, that his brother was "very controlling" and would fight with her if she intervened. (TR at 219) Ms. Miller also advised Dr. Rabe that K.M. was not sleeping and asked that Clonodine be prescribed for him. (TR at 219) At that time Dr. Rabe assessed K.M.'s problems as:

> Problem 1: Decreased concentration - minimal severity and minimal impairment.
>
> Problem 2: Side effects: insomnia - mild severity and mild impairment.
>
> Problem 3: Family dysfunction - moderate severity and moderate impairment.

TR at 219.

Dr. Rabe prescribed 0.1mg of Clonodine in addition to the daily dose of

Adderall, and further counseled Ms. Miller on structural behavioral intervention vis-a-vis her sons. (TR at 219)

In September of 2006, Dr. Rabe met with K.M., his mother and his brother. (TR at 217)  The plaintiff reported that K.M. was sleeping better on Clonodine, and that he had been held back in first grade. (TR at 217)  In his patient assessment, Dr. Rabe recorded K.M.'s problems as being: "Problem 1: Decreased concentration - mild severity and minimal impairment.  Problem 2: Educational performance deficit - moderate severity and moderate impairment." (TR at 217)  Dr. Rabe described K.M.'s response to his then current treatment as "satisfactory" and made no changes to his treatment plan. (TR at 217)

On November 10, 2006, K.M.'s new first grade teacher, Jamie Billie ("Billie"), completed a questionnaire about K.M. (TR at 177-184) Regarding the activities relating to acquiring and using information, Billie indicated that K.M. had an obvious problem doing math problems, no problem understanding and participating in class discussions or providing organized oral explanations and adequate descriptions, and a slight problem in all remaining activities. (TR at 178)  Regarding the activities relating to attending and completing tasks, Billie noted that K.M. had an obvious problem paying attention when spoken to directly; a slight problem in focusing enough to finish assigned activity or task,

refocusing to task when necessary, carrying out multi-step instructions, working without distracting self or others and working at reasonable pace/finishing on time; and no problem at all in the remaining seven activities. (TR at 179) K.M. was seen as having no problem in interacting and relating with others; no problem moving about and manipulating objects; and no problem caring for himself. (TR at 180-183) Billie stated that when K.M. took his medication he was "able to focus." (TR at 183)

On December 18, 2006, K.M. underwent a psychological evaluation conducted by David I. Finkelstein, Ph.D. ("Dr. Finkelstein"), at the request of the Disability Determination Services of the Massachusetts Rehabilitation Commission. (TR at 225-31) During the testing, the plaintiff reported that the medication K.M. was taking "helped 'a little,'" meaning that "'[t]he teacher is not having as (many) problems with him - every once in a while she sends home a note but not constantly - it's not as bad as last year.'" (TR at 226) Ms. Miller stated that K.M. "is very hyper...and he doesn't sleep well at night...[and that] [h]e is up most of the night." (TR at 226) Ms. Miller also told Dr. Finkelstein that K.M. "'sometimes...talks back to his teachers'" and to her, and that he was "'constantly fighting' with his brother." (TR at 226)

Dr. Finkelstein observed that while K.M. was in his office, "this youngster

appeared to be rather quiet and respectful toward me and toward his mother."

(TR at 226) The results of the psychological testing revealed that K.M.'s overall score on the intellectual testing was "within the Average range and at the 42nd percentile in comparison with the general population for his age." (TR at 229) Dr. Finkelstein summarized his conclusions as follows:

> [T]he evaluation was suggestive of a youngster who has been diagnosed with ADHD and is currently being medicated for it. He took his medication on the date of the evaluation and was able to focus reasonably adequately on most aspects of the testing. However, there were some indications during the testing of difficulties with reverse sequencing skills and difficulties with maintaining perceptual accuracy over time. Both of these difficulties could well be consistent with his diagnosis of ADHD.

TR at 231.

On January 9, 2007, Joan Kellerman, Ph.D. ("Dr. Kellerman"), completed a childhood disability evaluation form with respect to K.M. (TR at 232-37) Dr. Kellerman, after reviewing all the evaluations to date and the evidence in the record, opined that K.M. had less than marked limitation in acquiring and using

information[7], less than marked limitation in attending and completing tasks[8], and no limitation in interacting and relating with others[9] or in caring for himself. (TR at 234-35)   After assessing K.M. with ADHD, Dr. Kellerman concluded that:

> This child has average cognitive abilities.   He is repeating first grade and is doing grade level work.  He has a diagnosis of ADHD which is improved with tx and may account for his difficulties last year.   ADL's and social abilities are good.   Not severe.

TR at 237.

In October of 2007 when he was in the second grade, K.M. was evaluated by Dianne M. Gould ("Gould"), a speech and language pathologist with the Boston Public Schools. (TR at 256-260)  The purpose of the evaluation was to complete an Educational Assessment in the Areas of Suspected Disabilities. (TR at 256)  In summarizing her diagnostic impressions, Gould stated that although K.M. had repeated first grade and was then assigned to a regular second grade classroom, he "continues to experience difficulty in all areas of academics." (TR

---

[7]

Dr. Kellerman noted "[s]ome ongoing difficulty in math.  Otherwise, iq is average, acheivement (sic) is appropriate for grade 1." (TR at 234)

[8]

Dr. Kellerman noted that "[a]ttention and concentration have greatly improved...with tx." (TR at 234)

[9]

Dr. Kellerman noted that "[s]ocial skills appear to be a strength." (TR at 234)

at 258)  According to Gould:

> [K.M.] demonstrates strong skills in receptive &
> expressive vocabulary and short-term auditory recall
> with relative strengths in grammar. He struggles with
> listening comprehension and formulating sentences in
> both spoken and written language. [K.M.] cooperates,
> attends school regularly and is motivated to learn. He
> works hard to maintain attention but requires frequent
> redirection and needs to be closely monitored during
> small group activities.

TR at 256.

K.M. "scored within the average range" on both the Expressive One Word

Picture Vocabulary Test ("EOWPVT") and the Receptive One Word Picture

Vocabulary Test ("ROWPVT"). (TR at 257-58) His "difficulty with both verbal

and written output" were seen as "affecting his ability to meet grade level

benchmarks in written language and reading." (TR at 258) K.M.'s performance

in writing a narrative paragraph fell "within the lower end of the first grade

expectations." (TR at 258)

Gould opined that K.M.:

> accesses information through listening comprehension
> and working in cooperative groups. He accesses
> conversations, focuses and attends with prompting.
> When given additional time, graphic organizers and
> information repeated and clarified [K.M.] accesses age
> appropriate information through oral discussions,
> paired/shared reading and listening activities in a small

> group setting.  His present ability to follow directions, phonological skills, and word retrieval difficulty coupled with his inability to integrate language skills into the curriculum areas, organizational skills and reading comprehension difficulties affect his ability to perform consistently in the classroom setting.

TR at 259.

In her report, Gould indicated that various accommodations should be made for K.M., for example, giving him extra time to complete work, verbal cues, clarifying directions, graphic organizers, language based interventions and language therapy, all to be administered in a small group setting. (TR at 260)

K.M. began an Individualized Education Program (IEP) in October, 2007.

It is noted in the IEP that K.M.'s

> fluency skills in both reading and math are well below grade level.  He has a great deal of difficulty putting his thoughts and ideas down in written form.   His performance is low average in basic reading skills and math calculation skill. In math rasoning (sic) activities, he has a great deal of difficulty along with written language and written expression.

TR at 239.

K.M.'s IEP includes small group instruction, resource room instruction and speech therapy to help him make effective progress. (TR at 240)   More precisely, K.M. was to receive special help in reading from the resource room

teacher for 45 minutes per day, five days per week; special help in math from the resource room teacher for 45 minutes per day, five days per week; and special help with language from the speech and language teacher for 30 minutes per day, two days per week. (TR at 245) K.M. was also to be accommodated in his testing-taking by having "short periods with frequent breaks, small group setting, preferential seating, instructions repeated/clarified, use of a place marker, [and] assistance tracking test items." (TR at 247)

K.M.'s report card for the fall term of 2007 reveals he demonstrated "some evidence of meeting the standard" for reading, listening/speaking and math, but "little evidence of meeting the standard" for social studies. (TR at 356) Similarly, K.M. showed "some evidence of meeting the standard" in ten of fourteen areas of social leadership and social development, but "little evidence of meeting the standard" in three other areas. (TR at 356)

On February 8, 2008, K.M.'s second grade teacher, Ms. Der ("Der"), wrote a letter in which she states that K.M.'s "behavior has been either...unacceptable or average in school" in the prior few weeks. (TR at 354) The problem behavior included shouting out without raising his hand, impatience, difficulty in following directions, being untruthful, inability to focus, increased sensitivity and inability to get along with his classmates. (TR at 354)

On February 27, 2008, Elyse Gustin Fishkin, M.Ed., CCC-SLP ("Fishkin"), a speech-language pathologist, issued an educational placement recommendation for K.M. (TR at 359) After reviewing Gould's report and K.M.'s IEP, Fishkin opined that K.M. "exhibits significant communication deficits compounded by ADHD which interfere with his academic success in a regular classroom setting." (TR at 359) In her view, "[t]his youngster can improve in curricular areas and close the gap between his current level of performance in the first grade range and noted grade benchmarks for second grade if modifications and methodologies are in place in a small, highly structured classroom setting." (TR at 359)

At the hearing before the ALJ, Ms. Miller testified that she did not think that K.M. was doing too well in school, but that he was "making a little progress." (TR at 89) K.M. was not able to complete his morning work at school and, despite his mother's attempts to help him, K.M. was unable to understand his homework. (TR at 84, 89) The plaintiff testified that while she thought that K.M.'s IEP was working, she believed that he still needed more help at school than was being provided. (TR at 90) At of the time of the administrative hearing, Ms. Miller had not expressed her concerns about K.M.'s IEP or his need for additional assistance to K.M.'s teacher or school officials. (TR at 90-93)

In her testimony at the administrative hearing, the plaintiff stated that K.M. would be unable to respond to questions about a storybook that she had just read to him; "he has a problem holding on to information." (TR at 83) Ms. Miller also explained that K.M. just forgets things: "[l]ike you tell him something really simple and he just forgets, and he'll come back to you and he'll say what did you say or he'll grab something else back when I...told him to get something else. (TR at 97)

Approximately two months after the ALJ's decision issued, on June 26, 2008, plaintiff's attorney wrote a letter to the Appeals Council requesting a review of that decision and enclosing additional evidence that had not been presented to the ALJ. The new evidence included a letter from K.M.'s psychiatrist, Dr. Rabe, supporting Ms. Miller's request to the Boston Housing Authority ("BHA") to transfer to housing closer to Kenmore Square in Boston and for an apartment with separate bedrooms for her two older boys due to the "increased conflict" and "frequent fighting and violence" between them. (TR at 26-28) The Transfer Request Form filed by Ms. Miller and the BHA's Grievance Hearing Panel Decision in favor of Ms. Miller's request were also submitted to the Appeals Council. (TR at 27-30)

On April 9, 2009, plaintiff's attorney submitted further additional

evidence to the Appeals Council. (TR at 5-15)  This evidence included K.M.'s report card for the fall term for school year 2008-2009 which reflected that overall K.M. was showing either little or some evidence of meeting the standard in the overwhelming number of subject areas. (TR at 15)  Also included were medical records from K.M.'s week-long inpatient psychiatric treatment in February, 2009. (TR at 7-14)  This hospitalization resulted from K.M.'s "change in mental status for the past three weeks...[including] significant change in...mood and...behavior with increased violent acts and frequent verbal aggression." (TR at 7)

## IV. The Legal Framework

Ms. Miller, on K.M.'s behalf, is seeking review of the Commissioner's final decision pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act"). The Act provides in relevant part that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive....

Title 42 U.S.C. § 405(g) (emphasis added).

The Supreme Court has defined "substantial evidence" to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1 Cir., 1996); *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1 Cir., 1991).

"[W]hen determining whether a decision of the Commissioner is

supported by substantial evidence, the court must 'review[ ] the evidence in the record as a whole.' *Irlanda Ortiz v. Sec'y of HHS,* 955 F.2d 765, 769 (1st Cir.1991) (quoting *Rodriguez v. Sec'y of HHS,* 647 F.2d 218, 222 (1st Cir.1981))." *Buckley v. Astrue,* 2011 WL 462689, *1 (D.N.H., Jan. 7, 2011)(footnote omitted), report and recommendation adopted, 2011 WL 445831 (D.N.H. Feb. 4, 2011).

It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary. The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1 Cir., 1981)(internal quotation marks and citations omitted); *accord Lizotte v. Sec'y of Health & Human Servs.,* 654 F.2d 127, 128 (1 Cir., 1981).

Thus, the "court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." *Geoffroy v. Sec'y of Health &*

*Human Servs.*, 663 F.2d 315, 319 (1 Cir., 1981). The Commissioner's decision must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1 Cir., 1987), *cert. denied*, 484 U.S. 1012 (1988). "Even in the presence of substantial evidence, however, the Court may review conclusions of law, . . . and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'" *Musto v. Halter*, 135 F. Supp.2d 220, 225 (D. Mass., 2001)(quoting *Nguyen v. Chater*, 172 F.3d 31, 35 (1 Cir., 1999)(per curiam))(additional citations omitted).

The plaintiff bears the burden of proving that s/he is disabled and entitled to SSI benefits. 20 C.F.R. § 416.912(a). A child under the age of 18 is considered disabled and thus entitled to SSI if s/he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Title 42 U.S.C. § 1382c(a)(3)(C)(I). In order to establish ADHD as a disability, the regulations mandate as follows:

112.11 Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

And

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Paragraph B2 of 112.02 provides:

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available)  and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 CFR Pt. 404, Subpt. P, App. 1.

Under 42 U.S.C. § 1382c(a)(3)(C)(I), "the [Social Security Administration] has enacted a three-step sequential analysis to determine whether a child was eligible for SSI benefits on the basis of a disability." *Pollard v. Halter*, 377 F.3d 183, 189 (2 Cir., 2004)(citing 20 C.F.R. § 416.924(a)).  The first inquiry is whether the child is working and if the work the child is performing is substantial gainful activity.  If so, the claimant is automatically considered not disabled. 20 C.F.R. § 416.924(b).  The second inquiry is whether the child has a "medically determinable impairment(s) that is severe." 20 C.F.R.

§ 416.924(c). If not, the child is automatically considered not disabled. 20 C.F.R. § 416.924(c).

The third inquiry is whether the child has an impairment which meets, medically equals, or functionally equals a disability listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 416.924(d); *Pollard*, 377 F.3d at 189; *Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1151-52 (8 Cir., 2004). If not, or if the impairment does not meet the duration requirement, the child is considered not disabled. 20 C.F.R. § 416.924(d)(2).

In order to "functionally equal the listings," a child's impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . ." . 20 C.F.R. § 416.926a(a). An impairment results in a "marked" limitation when it "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities[,]"[10] and results in an

---

[10]

> Where 'marked' is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

"extreme" limitation when it "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i) & (3)(i). There are six domains of functioning, which consist of "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1).

An assessment of the extent of any limitations in the domain of "acquiring and using information" involves how well a child learns information and how well the child uses the information learned. 20 C.F.R. § 416.926a(g). An assessment of the extent of any limitations in the domain of "attending and completing tasks" involves consideration of how well the child is able to focus and maintain attention, and how well the child begins, carries through, and finishes activities, including the pace at which the child performs activities and the ease with which the child changes them. 20 C.F.R. § 416.926a(h).

## V. Discussion

In the instant case, the ALJ followed the required three-step sequential evaluation in determining whether K.M. was disabled. The ALJ found that K.M.

was a school-age child at the time that his application was filed, and that he was not engaged in any substantial gainful employment. (TR at 107) The ALJ next concluded that K.M. had the severe impairments of ADHD as well as speech and language disorder. (TR at 107) The ALJ then determined that K.M. did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did he have an impairment or combination of impairments that functionally equals the listings. (TR at 108) It is these last findings with which the plaintiff takes issue.[11]

Ms. Miller argues that the decision of the Commissioner must be either reversed or remanded because it is not supported by substantial evidence and it is based upon errors of law. The errors about which she complains are that the ALJ is purported to have selectively summarized the evidence, misinterpreted the evidence and misapplied the standard, and made an unsupported credibility finding. These arguments shall be addressed seriatim.

The plaintiff contends that in reviewing the evidence, the ALJ chose to

---

[11]

The plaintiff asserts, *inter alia*, that "K.M.'s ADHD, co-morbid disturbance, mood disorder and learning disability, meet or medically equal the listing for ADHD at 20 C.F.R., Part 404, Supt. P, App. 1, § 112.11," and then refers the Court to a memorandum filed before the Appeals Council for the "full argument" supporting this contention. (#11 at 10)

highlight that part of the record which supported his findings and ignored the contradictory evidence. Specifically, the plaintiff argues that the ALJ erred in his discussion of two of the six domains of function, acquiring and using information and attending and completing tasks.[12]

There is no requirement that an ALJ discuss every bit of evidence in the record when penning his decision. As the First Circuit has written, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *N.L.R.B. v. Beverly Enterprises-Massachusetts, Inc.*, 174 F.3d 13, 26 (1 Cir., 1999); *Quigley v. Barnhart*, 224 F. Supp.2d 357, 369 (D. Mass., 2002) ("[T]here is no explicit requirement that the ALJ make findings regarding every piece of evidence that is entitled to weight."). The failure to mention a particular record does not evince a failure to consider it. To the contrary, the presumption is "that the ALJ has considered all of the evidence before him." *Quigley*, 224 F. Supp.2d at 369. And, of course, the applicable standard bears repetition: "It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary,

---

[12] In the Applicable Law section of her brief, plaintiff's attorney states that K.M. is also "marked" in the domain of interacting and relating to others (#11 at 10), but this domain is not further discussed.

not the courts." *Ortiz*, 955 F.2d at 769 (citations omitted).

With respect to acquiring and using information, the ALJ wrote:

> <u>The claimant has less than marked limitation in</u>
> <u>acquiring and using information.</u> Despite medication
> and repeating first grade, the child still has difficulties
> with academics. His IEP notes low average
> performance as of October 2007....However, a recent
> report card appears average or better. In addition,
> speech and language testing revealed that the claimant
> had low average ability and that he learned better
> orally....

TR at 111.

Regarding the domain of attending and completing tasks, the ALJ found:

> <u>The claimant has less than marked limitation in</u>
> <u>attending and completing tasks.</u> Prior to being placed
> on medication in the spring of 2006, the claimant was
> markedly impaired. His teacher indicated that he was
> in constant motion and disruptive....He had to repeat
> the first grade. However, once he was initiated on
> medication, he was found to be able to focus
> reasonably well and had a mild decrease in
> concentration with an overall satisfactory response to
> his medication management.

TR at 111.

The ALJ acknowledged K.M.'s difficulties, and perhaps overstated his

achievement on his most recent report card. Nonetheless, Fahey, his first grade

teacher, observed K.M.'s improvement on medication. (TR at 205) This improvement is also reflected when comparing Fahey's questionnaire with that of his new first grade teacher, Billie. (*compare* TR at 201-210 with TR at 177-184) His second-grade teacher, Der, did write a letter about K.M.'s behavior at school, but it related to a recent change in his behavior which had become "unacceptable or average." (TR at 354)

Further, it must be noted that none of the doctors found K.M. to be markedly limited. In July, 2006, Dr. Rabe, the psychiatrist, described K.M.'s decreased concentration to be of "minimal severity and minimal impairment." (TR at 219) In September, 2006, Dr. Rabe made the identical assessment regarding decreased concentration and added that K.M.'s educational performance deficit was of moderate severity and moderate impairment. (TR at 217).

In December of 2006, although Dr. Finkelstein, the licensed clinical psychologist, observed that K.M.'s "capacity to focus appeared to deteriorate markedly over the length of the test," the doctor did not find the boy to have a "marked" impairment in maintaining concentration, persistence, or pace. (TR at 231) Rather, Dr. Finkelstein concluded that K.M. "was able to focus

reasonably adequately on most aspects of the testing." (TR at 231) After reviewing all of the evidence, in January, 2007, Dr. Kellerman found that K.M. had less than a marked limitation both in acquiring and using information, and in attending and completing tasks, and did not meet or functionally equal the listings. (TR at 234-235)

The report of Gould, the speech and language pathologist, is something of a mixed bag. (TR at 256-260) On the one hand, K.M. showed "strong skills in receptive & expressive vocabulary and short-term auditory recall and relative strengths in grammar." (TR at 256) He "scored within the average range" on two vocabulary tests. (TR at 257-258)  On the other hand, K.M. "continue[d] to experience difficulty in all areas of academics" (TR at 258), "struggle[d] with listening comprehension and formulating sentences in both spoken and written language" (TR at 256), and his narrative writing skills were well below grade level. (TR at 258)

In summary, the positives and negatives in the evidence were for the ALJ to evaluate and weigh in reaching his decision.  Considering the record as a whole, there is substantial evidence to support the ALJ's conclusion that K.M. did not have marked limitations in the domains of acquiring and using

information and attending and completing tasks.

To the extent that Ms. Miller argues that the ALJ erred in finding that her son's impairments did not meet or medically equal the ADHD listing, her argument must fail. There is substantial medical evidence supporting the ALJ's determination that K.M. did not have marked inattention, marked impulsivity, and marked hyperactivity resulting in marked impairment in at least two of the following: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, or maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11 (citing § 112.02(b)(2)). In July, 2006, Dr. Rabe, the psychiatrist, described K.M.'s decreased concentration to be of "minimal severity and minimal impairment." (TR at 219) In September, 2006, Dr. Rabe made the identical assessment regarding decreased concentration and added that K.M.'s educational performance deficit was of moderate severity and moderate impairment. (TR at 217).

In December of 2006, although Dr. Finkelstein, the licensed clinical psychologist, observed that K.M.'s "capacity to focus appeared to deteriorate markedly over the length of the test," the doctor did not find the boy to have a

"marked" impairment in maintaining concentration, persistence, or pace. (TR at 231) Rather, Dr. Finkelstein concluded that K.M. "was able to focus reasonably adequately on most aspects of the testing." (TR at 231) After reviewing all of the evidence, in January, 2007, Dr. Kellerman found that K.M. had less than a marked limitation both in acquiring and using information, and in attending and completing tasks, and did not meet or functionally equal the listings. (TR at 234-235) In short, this medical evidence provides substantial support for the ALJ's findings.

It is next argued that the ALJ's assessment of Ms. Miller's credibility is not supported by substantial evidence. In his decision, the ALJ wrote:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible to the extent alleged.

TR at 110.

A review of the record shows that there is, in fact, substantial evidence to support the ALJ's credibility assessment. For instance, although Ms. Miller testified about K.M.'s continuing inability to complete his morning work or

understand his homework, she had not been in contact with his teacher or school officials to express her concerns. (TR at 84, 89, 90-93) While the plaintiff reported to Dr. Rabe that K.M. was sleeping better on Clonodine and Dr. Rabe assessed the child's insomnia to be of mild severity and mild impairment (TR at 217, 219), three months later she told Dr. Finkelstein that K.M. was "up most of the night." (TR at 226) While Ms. Miller testified that K.M. could not answer questions about a storybook that she had just read him (TR at 83), Gould, the speech and language pathologist, opined that K.M. "accesses information through listening comprehension." (TR at 259)

The ALJ specifically found that "[t]he claimant had been placed on Adderall and had received a good response," apparently relying on Dr. Rabe's report. (TR at 217) The ALJ observed that K.M.'s "diagnosis of ADHD was improved with treatment," as a comparison of the two first grade questionnaires would show. (*Compare* TR at 210-210 with TR at 177-184) The ALJ noted that K.M.'s "full-scale IQ was average," as found by Dr. Finkelstein and Dr. Kennedy. (TR at 229, 278)

All of this evidence supports the ALJ's determination that although K.M.'s impairments would be expected to produce the symptoms described by his

mother, Ms. Miller's testimony "concerning the intensity, persistence and limiting effects of the claimant's symptoms" could be viewed as somewhat overstated or exaggerated. (TR at 110)  Making such a finding falls within the ALJ's province; there is no error here.

Ms. Miller is also aggrieved by the Appeals Council's failure to remand K.M.'s claim in light of the new evidence submitted on June 26, 2008 and April 9, 2009, after the ALJ had rendered his decision.  On September 25, 2009, the Appeals Council denied Ms. Miller's Request for Review. (TR at 1-4)   The Appeals Council noted that the new evidence provided by the plaintiff had been considered, but "that this information does not provide a basis for changing the Administrative Law Judge's decision." (TR at 1-2)  In short, the Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision." (TR at 1)

The plaintiff raises two arguments concerning the "new evidence."  She first contends that the Appeals Council erred in denying review of her son's claim despite the new evidence.    With respect to this initial argument, the First Circuit has held that an Appeals Council decision to deny a Request for Review "has all the hallmarks of a discretionary decision," and that "it has been

well established that a discretionary decision may be reviewable to the extent that it rests on an explicit mistake of law or other egregious error." *Mills v. Apfel*, 244 F.3d 1, 5 (1 Cir., 2001), *cert. denied*, 534 U.S. 1085 (2002); *Thibodeau v. Astrue*, 2009 WL 903851, *4 (D. N.H., Mar. 31, 2009); *Serrano v. Astrue*, 2009 WL 890480, *2 (D. P.R., Mar. 24, 2009); *Montalvo v. Barnhart*, 239 F. Supp.2d 130, 136 (D. Mass., 2003). Under the regulations, "[i]n reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470. The plaintiff contends that the Appeals Council erred in concluding that the additional evidence she submitted was not new, material or related to the time period before the ALJ issued his decision.

Ms. Miller's argument is not persuasive. The evidence with regard to the BHA Transfer Request and the action taken on that request, as well as Rabe's letter respecting the fighting between the Miller siblings, is not "new and material" evidence, but rather cumulative in nature. *Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136, 139 (1 Cir., 1987) ("Under 42 U.S.C. § 405(g), remand is appropriate only where the court determines that further

evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing.") The record reflects that in the summer of 2006, Ms. Miller told Dr. Rabe that K.M. and his brother were fighting constantly and that the brother was "very controlling" and would even fight with her. (TR at 219[13]) There is no indication in Dr. Rabe's September 17, 2007 letter that the "increased conflict" between the brothers was caused by a change in K.M.'s condition rather than his sibling's documented controlling nature and his history of ADHD along with oppositionality. (TR at 279)

The remaining new evidence, the first quarter third-grade report card and the February 2009 hospitalization records, clearly relate to a time period subsequent to April 27, 2008, the date on which the ALJ's decision issued, and so should not have been considered by the Appeals Council under the regulations. 20 C.F.R. § 416.1470(b). This evidence cannot be bootstrapped into a prior time period by arguing generally that they relate to K.M.'s ongoing learning difficulties and mental impairments. Indeed, these records reflect changes in K.M.'s academic performance and his mental condition. (*Compare*,

---

[13]

The plaintiff also reported to Dr. Finkelstein in December, 2006, that her two older sons were always fighting. (TR at 226)

i.e., TR at 15 with TR at 356)  As the medical records indicate, on February 13, 2009, K.M. presented at Children's Hospital "with change in mental status for the past three weeks.  Per mom and fiancee, the patient has had a significant change in his mood and his behavior with increased violent acts and frequent verbal aggression." (TR at 7)  The fact that Ms. Miller filed a second application for SSI on behalf of  K.M. two weeks after his hospitalization and that application was approved does not bear on the issue: "While these occurrences might be sufficient to establish a current disability, they do not pertain to the relevant period [prior to]...the date of the ALJ's decision...and therefore do not constitute 'new evidence' warranting a remand of that decision." *La Rochelle v. Callahan,* 1998 WL 686718, *5 (D. Mass., Sept. 28, 1998).

Second, Ms. Miller argues that remand is required under 42 U.S.C. § 405(g) based on the new, material evidence and good cause.  Section 405(g) provides in relevant part that "[t]he court may... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  The plaintiff asserts that she can meet the statutory criteria for a

"sixth-sentence remand", i.e., that the new evidence is material and there is good cause for not having submitted it earlier, so, consequently, a remand is warranted.

The Commissioner has pointed to a flaw in the plaintiff's argument. The Supreme Court has explained that "[t]he sixth sentence of § 405(g) plainly describes...[a] remand [] appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)(footnote omitted); *Melkonyan v. Sullivan*, 501 U.S. 89, 97 (1991)(pursuant to a sixth-sentence remand, "the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding."). The phrase "at any time of the administrative proceeding" includes action at the Appeals Council level:

> A remand to the Commissioner is proper under sentence six when new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court.

\*\*\*\*\*

> Sentence six allows the district court to remand to the Commissioner to consider previously unavailable evidence; it does not grant a district court the power to remand for reconsideration of evidence previously considered by the Appeals Council. Because evidence properly presented to the Appeals Council has been considered by the Commissioner and is part of the administrative record, that evidence can be the basis for only a sentence four remand, not a sentence six remand.

*Ingram v. Commissioner of Social Sec. Admin*., 496 F.3d 1253, 1267, 1269 (11 Cir., 2007)(internal citations omitted).

In the instant case, the new evidence was submitted to the Appeals Council by the plaintiff. The Appeals Council explicitly stated that the new evidence had been considered when making its decision, and ordered that the new evidence be made part of the administrative record. (TR at 4) Because the new evidence was available and considered during the administrative proceeding, it cannot serve as the basis for a sentence six remand.

## VI. Conclusion and Order

For all the reasons stated, it is ORDERED that the Plaintiff's Motion To Reverse Or Remand The Decision Of The Commissioner Of The Social Security Administration (#11) be, and the same hereby is, DENIED. It is FURTHER ORDERED that the Defendant's Motion For Order Affirming Commissioner And Opposition To Plaintiff's Motion (#13) be, and the same hereby is, ALLOWED. Final judgment shall enter for the defendant.

/s/ Robert B. Collings

ROBERT B. COLLINGS
United States Magistrate Judge

June 16, 2011.